UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 19-CIV-61306-RUIZ/SELTZER

JEAN EMMANUEL PIERRE-LOUIS,
EVENS HILAIRE, ASSADE VEDRINE,
JEAN CLAUDE DORELUS, WILFRID
SAINT LOUIS, ERILES MAXEAN, and,
WILLY SAINTIL

       Plaintiffs,

v.

SP PLUS CORPORATION, a Delaware
Corporation, and BAGGAGE AIRLINE
GUEST SERVICES, INC., a Florida
corporation doing business as BAGS,

       Defendants.

_____/

## DEFENDANTS BAGGAGE AIRLINE GUEST SERVICES, INC. AND ALVARO SILVA'S MOTION FOR SUMMARY JUDGMENTAND SUPPORTING MEMORANDUM OF LAW

Defendants[1] Baggage Airline Gust Services, Inc. ("BAGS") and Alvaro Silva ("Silva") (collectively, "Defendants"), under Fed. R. Civ. P 56, move for summary judgment on the claims of Plaintiffs Jean Pierre-Louis ("Pierre-Louis"), Evens Hilaire ("Hilaire"), Assade Vedrine ("Vedrine"), Jean Claude Dorelus ("Dorelus"), Wilfrid Saint Louis ("Saint Louis"), Eriles Maxean ("Maxean"), and Willy Saintil ("Saintil") (collectively, "Plaintiffs").

## INTRODUCTION

Plaintiffs cannot succeed on their federal overtime or state law straight time claims because the undisputed record shows that BAGS maintained time records showing the number of

_____

[1] The parties stipulated to the dismissal of SP Plus.  (ECF No. 59.)

hours Plaintiffs worked in each workweek and paid them the amounts due as reflected in those time records, including overtime hours.  Plaintiffs' unsupported and contradictory assertions cannot create a genuine dispute of material fact sufficient to overcome summary judgment.

First, Plaintiffs cannot meet their burden under the Fair Labor Standards Act ("FLSA") to prove the amount and extent of their alleged injury as a matter of just and reasonable inference. This is because each Plaintiff, under oath, has provided three or more versions of the number of hours they claim BAGS failed to compensate them, leaving the question unascertainable and unprovable.  In short, Plaintiffs' ever-changing stories make it impossible for them to establish any version of events as a matter of law based on competent, admissible evidence.

Second, and relatedly, Plaintiffs cannot establish the amount and extent of their purported unpaid work as a matter of just and reasonable inference because their own testimony shows that their estimates of alleged unpaid work are unsubstantiated and speculative.

Third, for these same reasons, Plaintiffs cannot establish damages as they must to do succeed on their state law claims.

Fourth, the undisputed, objective record shows that Plaintiffs took the lunch breaks they now claim they did not take.  For instance, four Plaintiffs testified that they only clocked in and out for meal breaks when they actually took uninterrupted meal breaks, and the objective record shows they clocked themselves in and out for the vast majority of their recorded breaks.

Fifth, Plaintiffs' breach of contract claim against BAGS fails because Plaintiffs all signed (or wrote their name on) an acknowledgement which stated that the only way they could have a contract with BAGS would be through a contract signed by the President of BAGS, which Plaintiffs do not have because the President of BAGS never executed such a contract.  Further,

Plaintiffs, by their own admission, had no contract with BAGS and cannot establish the elements of the alleged contract they seek to enforce.

Finally, Plaintiffs' Broward County Living Wage Ordinance ("BCLWO") claim fails because Plaintiffs, given their own testimony, cannot show that BAGS paid them less than was required under the BCLWO.

## **BACKGROUND**

BAGS employed Plaintiffs as wheelchair agents at the Fort Lauderdale-Hollywood International Airport.  (SOF ¶ 3)  As wheelchair agents, Plaintiffs' primary responsibility was transporting passengers of non-party Delta in wheelchairs on outbound flights from the ticket counter to the gate, from the gate to the aircraft, and, on inbound flights, from the aircraft to baggage claim.  (SOF ¶ 4)  BAGS employed Plaintiffs – except for Saintil, whom BAGS terminated in August 2018 – until it lost its contract with Delta in May 2019.  (SOF ¶¶ 7-8)

Starting on December 26, 2016, BAGS used a timekeeping system provided by non-party Ceridian to track employee time and attendance.  (SOF ¶ 23)  With Ceridian, the primary way BAGS tracked time was by employees entering their employee IDs and using the biometric fingerprint scanner to clock in and out.  (SOF ¶ 24)  Plaintiffs admitted that they clocked in and out, including for breaks, using that system.  (SOF ¶ 25)  BAGS required Plaintiffs to take a 30-minute meal break each day they worked six or more hours.  (SOF ¶ 79)

BAGS used the clock-in and clock-out times from Ceridian to determine the number of hours worked by each Plaintiff during each workweek.  (SOF ¶ 27)  When any Plaintiff worked over 40 hours in a week, BAGS paid the Plaintiff the applicable overtime premium.  (SOF ¶ 27.)

Plaintiffs, except for Pierre-Louis, worked on the evening shift.  (SOF ¶ 84)  The evening shift ran from 5:30 p.m. to 12:30 or 1:30 a.m.  (SOF ¶ 84)  When the last flight departed around

8:00 p.m., both the Delta ticket counter and TSA screening point closed.  (SOF ¶ 85-86)  From that point on, Plaintiffs had only to service customers on inbound flights.  (SOF ¶ 89)

There were, on average, 7.4 flights per day scheduled to arrive after 8:00 p.m.  (SOF ¶ 90)  This led to almost daily hour-plus periods on the evening shift where wheelchair agents had no work to do.  (SOF ¶¶ 91, 95)  BAGS expected, and night shift Plaintiffs understood, that they should take meal breaks during this down time.  (SOF ¶ 92)

Pierre-Louis, who worked on the day shift, took his breaks toward the end of his shift. (SOF ¶¶ 96-97)  His shift ran from 4:00 a.m. to 12:30 p.m.  (SOF ¶ 96)

Dorelus, Maxean, Pierre-Louis, and Saint Louis testified that they took their meal breaks in the break room.  (SOF ¶ 80)  While Plaintiffs allege that Delta agents would interrupt them in the break room, disinterested non-party Delta's corporate representative testified that not only did Delta agents never interrupt any BAGS employee in the break room but also that Delta agents could not even get into the break room due to the break room door's access system.  (SOF ¶¶ 81-82)  Delta's corporate representative also testified that he would never ask a BAGS employee to interrupt his or her break.  (SOF ¶ 83)

## LEGAL STANDARD

Summary judgment should be granted whenever the pleadings, depositions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party "to the extent supportable by the record."  *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007).  The mere existence of one or more factual disputes between the parties will not defeat a motion for summary judgment if the disputed issues are not material.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986).  For an issue of fact to be material, it must be outcome determinative.  *Id.* at 248.

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  The non-moving party must produce substantial evidence to defeat a motion for summary judgment.  *Kesinger v. Herrington*, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  The mere existence of a scintilla of evidence to support a plaintiff's position is insufficient to avoid a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 247-48, 252.

## ARGUMENT

## I.    PLAINTIFFS' OVERTIME CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs' overtime claims fail as a matter of law because BAGS paid Plaintiffs all overtime due and Plaintiffs cannot create or manufacture a genuine issue of material fact about whether BAGS did so.

To prove an FLSA overtime violation, Plaintiffs bear the initial burden of proof.  *Anderson v. Mt. Clemens Potter Co.*, 328 U.S. 680, 686-87 (1946) ("An employee who brings suit under s 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation … has the burden of proving that he performed work for which he was not properly compensated.");  *Allen v. Bd. of Public Educ. for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007).  Plaintiffs must prove that (a) they worked overtime without compensation and (b) Defendants knew or should have known of the time worked.  *Allen*, 495 F.3d at 1314; *see also Reich v. Dep't of Conversation and Nat. Res.,* 28 F.3d 1076, 1081-82 (11th Cir. 1994); 29 C.F.R § 785.11.

"[A] plaintiff must show that the employer failed to keep adequate records and prove that he has in fact performed work for which he was improperly compensated" before the *Mount Clemens* burden shifting framework kicks in.  *Rindfleisch v. Gentiva Health Servs., Inc.*, No. 10-

CV-3288, 2016 WL 4771390, at *5 (N.D. Ga. Feb. 23, 2016).  "This is especially true where the

employer has kept records that reflect overtime hours." *Straley*, 2009 WL 10670500, at *2

(citing *Ettiene v. Inner-County Security Corp.*, 173 F.3d 1372, 1376 (11th Cir. 1999) ("this

circuit has employed the burden-shifting analysis in situations where no records were kept at all

or no overtime was recorded")).  To meet that burden, a plaintiff must "produce[] sufficient

evidence to show the amount and extent of that work as a matter of just and reasonable

inference." *Mt. Clemens Pottery*, 328 U.S. at 687; *see also Holaway v. Stratasys, Inc.*, 771 F.3d

1057, 1060 (8th Cir. 2014) (granting summary judgment to employer who kept no time records

because employee could not establish amount and extent of his overtime work as a matter of just

and reasonable inference).

> **A.   Plaintiffs Cannot Meet Their Burden Of Establishing The Amount And Extent Of Purported Uncompensated Overtime As A Matter Of Just And Reasonable Inference**

Plaintiffs cannot establish the amount and extent of their purported uncompensated

overtime for two reasons: First, they have given continually evolving and ever-changing

testimony on that subject and, second, their estimates of unpaid overtime are bare,

unsubstantiated, and speculative.

To survive summary judgment, Plaintiffs need to "produc[e] sufficient evidence to show

the amount and extent of that [alleged uncompensated] work as a matter of just and reasonable

inference." *Jackson v. Corr. Corp. of Am.*, 606 F. App'x 945, 952 (11th Cir. 2015).  As

numerous courts have found, Plaintiffs cannot meet their burden if they provided "contradictory

and bare assertions of [their] overtime hours worked," *Holaway*, 771 F.3d at 1059, because "the

jury would hear these … different estimations that [Plaintiffs] ha[ve] made and would have to

choose one of them" and as a result "would simply be picking a number based on pure

speculation," *Rindfleisch*, 2016 WL 4771390, at *7.  *See also Ihegword v. Harris Cty. Hosp.*

*Dist.*, 555 F. App'x 372, 374 (5th Cir. 2014) (finding plaintiff could not meet her burden where there were "contradictions between Ihegword's deposition testimony and her written declaration"); *Joiner v. Bd. Of Trs. Of Flavius J. Witham Memorial Hosp.*, 13-CV-555, 2014 WL 3543481, at *7 (S.D. Ind. July 17, 2014) (finding plaintiff could not meet his burden where plaintiff testified defendant interrupted his lunches "'practically every day,' 'two or three times a week,' and 'once in a while.'"); *Robinson v. Sailormen, Inc.*, No. 14-CV-44, 2017 WL 10635662, at *3 (N.D. Fla. Sept. 22, 2017) (plaintiff failed to meet her burden where she relied on "vague and contradictory estimates that lack any factual basis").  Relatedly, "an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference."  *Ihegword*, 555 F. App'x at 375; *see also Rindfleisch*, 2016 WL 4771390, at *6.

Plaintiffs here cannot establish the amount of overtime they allegedly worked as a matter of just and reasonable inference because they repeatedly change their testimony regarding the amount of uncompensated overtime they worked:

**Eriles Maxean:**[2]

- **2/1/19 Testimony:** Since "early 2018 … the Company has ***implemented*** a continuing pattern and practice of discriminating against Haitian employees in the following ways: … Haitian employees are often not permitted to take a break in the middle of their shift.  When they are 'permitted' to take a break, they are usually called back to work without sufficient time for the break and work off-the-clock. This time working is off-the-clock, for which I am not paid…" (SOF ¶ 30 (emphasis added))

- **10/18/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 50 weeks in 2017,

---

[2] While Maxean is dismissing his FLSA claim, his contradictory testimony also bars his state law claims for reasons discussed *infra*.

50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 31)  "[R]egularly" worked unpaid overtime. (SOF ¶ 32)

- **11/15/19 Testimony:** "To the best of my ability, I do not believe that I worked more than 40 hours per week during the time period of January, 2017 through May, 2019. I do not recall working any overtime in 2016."  (SOF ¶ 33)  "From May of 2016 until May of 2019, I only took a 30-minute meal break on approximately 10-15% of my shifts."  (SOF ¶ 34)

- **11/19/19 Testimony:** Alleged practice of stopping Haitian employees like Maxean from taking lunch breaks and interrupting his lunch breaks "was implemented after [K]arla was hired" in "early 2018."  (SOF ¶¶ 30, 35)

**Jean Claude Dorelus:**

- **10/24/19 Testimony:** Worked unpaid overtime in 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 37)  "[R]egularly" worked unpaid overtime.  (SOF ¶ 38)

- **11/10/19 Testimony:** Worked only *two weeks* with unpaid overtime from May 2016 to the end of his employment with BAGS in May 2019.  (SOF ¶ 39)  "From May of 2016 until May of 2019, I only took a 30-minute meal break on approximately 20% of my shifts."  (SOF ¶ 40)

- **11/16/19 Testimony:** Took uninterrupted meal breaks on 40% to 50% of his shifts. (SOF ¶ 41)

**Evens Hilaire:**

- **2/1/19 Testimony:** From December 2018 forward, "I do not even work the promised 40-hours each week."  (SOF ¶ 42)

- **10/30/19 Testimony:** Worked unpaid overtime in 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 43)  "[R]egularly" worked unpaid overtime.  (SOF ¶ 44)

- **11/11/19 Testimony:** Variously testifying that, as a wheelchair agent, he never took a

30-minute meal break, took a 30-minute meal break on 10% to 20% of his shifts, and took a 30-minute meal break on 5% to 10% of his shifts.  (SOF ¶ 45.)  Worked fewer than 40 hours every week in 2019.  (SOF ¶ 46)

- **11/30/19 Testimony:**  Worked unpaid overtime in 24 weeks in 2017, 22 weeks in 2018, and two weeks in 2019.  (SOF ¶ 47)   Took a 30-minute meal break on approximately ***90% of his shifts***.  (SOF ¶ 48)

**Wilfrid Saint Louis:**

- **2/2/19 Testimony:** Since "early 2018 … the Company has ***implemented*** a continuing pattern and practice of discriminating against Haitian employees in the following ways: … ***I used to work 40 hours a week. Since approximately December of 2018, I only work 26 to 28 hours a week***. . . . Haitian employees are often not permitted to take a break in the middle of their shift.  When they are 'permitted' to take a break, they are usually called back to work without sufficient time for the break and work off-the-clock.  I am not paid for time working off-the-clock."  (SOF ¶ 49 (emphasis added))

- **10/28/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 50)  "[R]egularly" worked unpaid overtime.  (SOF ¶ 51)

- **11/15/19 Testimony:** Worked 10 weeks of unpaid overtime in 2016, no unpaid overtime in 2017, 22 weeks of unpaid overtime in 2018, and no unpaid overtime in 2019.  (SOF ¶ 52)

- **12/3/19 Testimony:** Took a 30-minute lunch break "[p]robably 20 percent of the time" during his employment.  (SOF ¶ 53)

**Assade Vedrine:**

- **2/1/19 Testimony:**  "As to me specifically, before the Company started hiring

predominately Hispanic employees [in early 2018], I worked 40 hours per week. Now, however, I only work 26 to 28 hours each week."  (SOF ¶ 54)

- **10/24/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 55)  "[R]egularly" worked unpaid overtime. (SOF ¶ 56)

- **11/12/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 14 weeks in 2017, 20 weeks in 2018, and no weeks in 2019.  (SOF ¶ 57)  "From May of 2016 until May of 2019, I only took a 30-minute meal break on approximately 10% of my shifts."  (SOF ¶ 58)

- **11/14/19 Testimony:** Took an uninterrupted meal break on "about 15 percent" of his shifts.  (SOF ¶ 59)

**Jean Pierre-Louis:**

- **2/4/19 Testimony:** "Since … in or about May 2018 … the Company has ***implemented*** a continuing pattern and practice of discriminating against Haitian employees in the following ways: … Haitian employees are often not permitted to take a break in the middle of their shift. When they are 'permitted' to take a break, they are usually called back to work without sufficient time for the break and work off-the-clock. This time working is off-the-clock, for which I am not paid…"  (SOF ¶ 61 (emphasis added))

- **10/24/19 Testimony:**  Worked unpaid overtime in 30 weeks in 2016, 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 65)

- **11/7/19 Testimony:** alleged off-the-clock work "started way before then [May 2018]." (SOF ¶ 62)  Worked only four days per week after the "bid system" was put in place.  (SOF ¶ 63)

- **11/12/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 36 weeks in 2017,

34 weeks in 2018, and eight weeks in 2019.  (SOF ¶ 65)  "From May of 2016 until May of 2019, I only took a 30-minute meal break on approximately 10-12% of my shifts."  (SOF ¶ 66)

**Willy Saintil:**

- **2/4/19 Testimony:**  "I believe that Alvaro gives Haitian employees *so few hours with the intentions that Haitian employees will resign* — and some Haitian employees have resigned to look for work elsewhere. As to me specifically, newer Hispanic employees worked the same, if not more, hours each week than I did, even though I had more experience."  (SOF ¶ 67 (emphasis added))

- **10/18/19 Testimony:** Worked unpaid overtime in 30 weeks in 2016, 50 weeks in 2017, 50 weeks in 2018, and 20 weeks in 2019.  (SOF ¶ 68)  "[R]egularly" worked unpaid overtime. (SOF ¶ 72)

- **11/15/19 Testimony:** Worked unpaid overtime during 10 weeks in 2016, six weeks in 2017, and 18 weeks in 2018.  (SOF ¶ 69)

- **12/7/19 Testimony:**  BAGS terminated Saintil in August 2018.  (SOF ¶ 7)

    Therefore, the Court should enter summary judgment for Defendants.

    This result is supported by *Rindfleisch*.  There, the court entered summary judgment for defendant even though plaintiffs established "that accurate records were not kept" by defendant (unlike here) because plaintiffs (like here) offered contradictory testimony about how many hours of overtime they worked and therefore could not meet their burden to establish the amount and extent of their uncompensated overtime as a matter of just and reasonable inference. *Rindfleisch*, 2016 WL 4771390, at *6-7, 2-13, 16, 21.  In *Rindfleisch*, one plaintiff first testified that she worked 18 hours of overtime every week and later stated she worked overtime in only seven workweeks, while another initially testified that she worked at least 20 hours of overtime

per week and then changed her testimony to state she worked on average less than five hours of overtime per week.  *Id*. at *12, 16.  The court found that defendant could have summary judgement because plaintiffs could not meet their burden of showing the amount and extent of their work as a matter of law because of their contradictory testimony:

> The Court does not need to find that Plaintiff's varying testimonies are a "sham;" **it is enough to find that a reasonable jury would have no basis upon which to select among the varying and contradictory offers of overtime hours worked**.  The jury would simply be picking a number based on pure speculation.

*Id*. at *16 (emphasis added).

This same result is also supported by *Robinson*.  In *Robinson*, plaintiff claimed that defendant made her work off-the-clock.  *Robinson*, 2017 WL 10635662, at *1.  In her deposition, she testified that defendant "shorted her about three or four hours every other month," and later filed an affidavit stating that defendant "owes her about 80-90 hours of unpaid overtime—a calculation that's about four times greater than her original guess."  *Id*. at *2.  The court found that plaintiff could not survive summary judgment:

> [Plaintiff] bears the burden of proving the amount and extent of her uncompensated work, and to do so, she must produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  Plaintiff has failed in this regard, relying instead upon vague and contradictory estimates that lack any factual basis to support a just and reasonable inference. Summary judgment is appropriate on this claim.

*Id*. at *3 (citation and quotation marks omitted).  Other courts have reached similar conclusions. *See Holaway*, 771 F.3d at 1059; *Ihegword*, 555 F. App'x at 375; *Joiner*, 2014 WL 3543481, at *7 (finding plaintiff could not meet his burden where plaintiff testified defendant interrupted his lunches "'practically every day,' 'two or three times a week,' and 'once in a while.'").  This Court should reach this same conclusion.

Relatedly, Plaintiffs cannot meet their burden because they rely on "unsubstantiated and

speculative estimate[s] of uncompensated overtime" which "do[o] not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference." *Ihegword*, 555 F. App'x at 375.

Putting aside the previously-discussed contradictions, Plaintiffs' deposition testimony shows that their claims about the time they contend they worked off-the-clock is speculative. For instance, Jean Pierre-Louis could not even estimate how many times his lunch breaks were interrupted. (SOF ¶ 64) Similarly, Vedrine could not state how many times he took an uninterrupted meal break. (SOF ¶ 60) Because of their vague and speculative testimony, the Court should enter summary judgment for Defendants.

This result is supported by *Brand v. Comcast Corp.*, 135 F. Supp. 3d 713 (N.D. Ill. 2015). There, plaintiffs (like here) alleged that they worked through their unpaid lunches. *Brand*, 135 F. Supp. 3d at 720. The court found that plaintiffs had submitted sufficient evidence to call into question the accuracy of defendant's records and thus were "entitled to show the amount and extent of their unpaid work under the relaxed 'just and reasonable inference' evidentiary standard." *Id*. at 742. But the court entered summary judgment for the employer because the plaintiffs could not meet that standard because they relied on nearly identical bare allegations and undocumented estimates of lunch breaks interrupted as Plaintiffs allege here:

> To meet his burden Brand points to his testimony that during the relevant period he only took lunch breaks "maybe once or twice, maybe three times a month, if I was lucky." Similarly, Jackson points to his testimony that he worked "[o]ver four years, probably three years' worth" of his lunches, and "70 to 75 percent of the time lunch was interrupted." The language they use about how often they "maybe" or "probably" worked through lunch suggests guesswork. They point to no explanation as to how they reached their estimates nor do they point to any memory "triggering factors" or other details providing the basis for their recollection. "Bare allegations and vague undocumented estimates" are insufficient to survive summary judgment.

*Id*. (citations omitted).  Other courts have reached similar conclusions.  *See Goal v. Retzer Restaurants, Inc.*, No. 09-CV-00137, 2010 WL 4867966, at *9 (E.D. Ark. Nov. 3, 2010) (holding that plaintiff's "bald assertions" that he was clocked in after he worked and that his employer altered his time, or clocked him out before he was finished working, were insufficient to avoid summary judgment); *Millington v. Morrow Cnty. Bd. of Comm'rs*, No. 2:06-CV-347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("Plaintiff's bare allegation that he worked an average of five hours every week at home is insufficient to meet his burden of proof. Mere conclusory, factually unsupported allegations are insufficient to withstand a motion for summary judgment.").[3]  This Court should reach the same conclusion.

## II.   SIMILARLY, PLAINTIFFS' STATE LAW CLAIMS FAIL BECAUSE THEY CANNOT PROVE THE AMOUNT AND EXTENT OF THEIR ALLEGED UNPAID HOURS

For the same reason Plaintiffs cannot prove the amount and extent of their alleged uncompensated overtime, Plaintiffs cannot prove damages on their state law claims as a matter of law.

Under Florida law, a party seeking to recover lost wages must establish those lost wages "with reasonable certainty." *Otis Elevator Co. v. Scott*, 551 So.2d 489, 490 (Fla. Ct. App. 1989); *see also Russ v. Berchtold Corp.*, No. 12-CV-24482, 2013 WL 12092681, at * (S.D. Fla. Nov. 19, 2013).  Absent cases applying this standard in "off-the-clock" cases, federal courts, interpreting Florida law, apply the same standard as that annunciated in *Mt. Clemens Pottery* in, for instance, breach of contract actions to determine damages for lost profits.  *NACM Tampa,*

---

[3]   *See also Simmons v. Wal-Mart Assocs., Inc.*, No. 2:04-CV-51, 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005) (holding that employee's bald assertions of overtime hours worked, unsupported by any documentation, was insufficient to create a genuine issue of material fact); *Daniels v. Finish Line, Inc.*, No. 07-CV-1501, 2008 WL 4814008, at *3 (E.D. Cal. Oct. 31, 2008) (holding that plaintiff's failure to submit any evidence beyond bare allegations and vague undocumented estimates to support his claim that he was not adequately compensated was insufficient to survive summary judgment).

*Inc. v. Sunray Notices, Inc.*, No. 15-CV-1776, 2017 WL 2209970, at *8 (M.D. Fla. Feb. 8, 2017)

("'while the damages may not be determined by mere speculation or guess, it will be enough if

the evidence shows the extent of the damages as a matter of just and reasonable inference,

although the result be only approximate'") (quoting *G.M. Brod & Co. v. U.S. Home Corp.*, 759

F.2d 1526, 1539 (11th Cir. 1985)). Further, Courts interpret Florida's wage laws under the

FLSA:

> The Wage Amendment makes plain that employees receive the
> same protection under state law that they enjoy under the Fair
> Labor Standards Act. Its subsection (b) gives its terms
> 'Employer,' 'Employee' and 'Wage' the meanings established
> under the federal Fair Labor Standards Act (FLSA) and its
> implementing regulations." Use of the word 'meanings' connotes
> that the Wage Amendment incorporates not only the definitions of,
> but also the criteria for coverage as, an employer and an employee
> under federal law. And subsection (f) declares an intention that
> case law, administrative interpretations, and other guiding
> standards developed under the federal FLSA shall guide the
> construction of this amendment and any implementing statutes or
> regulations.

*Anagnos v. Nelsen Residence, Inc.*, 721 F. App'x 901, 903–04 (11th Cir. 2018) (quotation marks,

ellipses, and internal citations omitted). The Court should apply the *Mt. Clemens Pottery*

standard to Plaintiffs' state law unpaid wages claims.

Since Plaintiffs cannot meet the *Mt. Clemens Pottery* standard to their claims even if,

counterfactually, they could create a genuine issue of material fact about the accuracy of

BAGS's time records, they cannot meet the standard under their parallel Florida law claims.

Therefore, the Court should enter summary judgment for Defendants on Plaintiffs' state law

claims.

## III.   PLAINTIFFS CANNOT OVERCOME SUMMARY JUDGMENT THROUGH TESTIMONY BLATANTLY CONTRADICTED BY THE OBJECTIVE RECORD

Plaintiffs' claims also fail as a matter of law because the undisputed objective record

contradicts their claims.  "[W]hen "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment." *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (quotation marks omitted.)  For example, in *Scott v. Harris*, 550 U.S. 372, 376 (2007), plaintiff claimed that defendant police officer used excessive force when he rammed plaintiff's fleeing vehicle. The lower courts denied defendant's motion for summary judgment based on plaintiff's testimony he was "in control of his vehicle" and not a threat to other motorists or pedestrians.  *Id*. at 378-79. The Supreme Court disagreed. It held that a videotape of the chase showed something different "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury."  *Id*. at 380. The Supreme Court held that "[w]hen, opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment," and ruled that "[plaintiff's] version of events is so utterly discredited by the record that no reasonable jury could have believed him."  *Id*. at 380-81.

Similarly, in *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010), plaintiff sued for deliberate indifference to his medical needs.  *Id*. at 403.  Plaintiff testified that, after he arrived at a hospital, a doctor "requested immediate surgery for his injured knee but was denied permission by [the prison medical director] to perform the operation."  *Id*.  The Eleventh Circuit held that the district court appropriately disregarded this testimony based on the doctor's testimony he did not say this and prison records that showed "that at the time of the incident, [the prison medical director] was not present in the prison."  *Id*.  The Eleventh Circuit also held that the district court appropriately disregarded plaintiff's testimony that the prison medical director

16

"refused to look at his knee and told him  it would take two to three months to schedule an MRI" because the prison medical director's records "note[d] that [plaintiff] had fractured his patella, could not extend his leg, and had swelling in his left knee" and that the prison medical director "requested an urgent consultation by an orthopedist to evaluate the injury."  *Id*. at \*3.

The district court in *Ihegword v. Harris Cty. Hosp. Dist*., 929 F. Supp. 2d 635 (S.D. Tex. 2013), *aff'd*, 555 F. App'x 372 (5th Cir. 2014), applied this principle in the FLSA context. There, *Ihegword* tried to cast doubt on her employer's time records by testifying that she was told to clock out at the end of her shift and then to keep working if there was additional work to do. *Id*. at 665. The court held this testimony was "soundly refuted by [the employer's] records of plaintiff's time card reports between December 24, 2007, and her discharge on May 29, 2009, which show that plaintiff worked past her scheduled shift on the clock, ranging from a few minutes to almost two hours." *Id*.; *see also Krohn v. David Powers Homes, Inc.,* No. 07-CV-3885, 2009 WL 1883989, at \*3 (S.D. Tex. June 30, 2009) ("[T]he diary entries and [p]laintiff's general testimony regarding her hours at the office are refuted by records from the Harris County Toll Road authority which establish times that [p]laintiff's vehicle entered the toll road system . . . The Court does not credit Plaintiff's testimony that it was always someone else driving her car when the toll road records show that she was not at the office when she claims to have been there."); *Grosswiler v. Freudenberg-NOK Sealing Techs.,* 14-CV-1551, 2015 WL 4994304, at \*3 (N.D. Ohio Aug. 19, 2015), aff'd, 642 F. App'x 596 (6th Cir. 2016) (finding plaintiff's testimony and timesheets with handwritten edits did not create a genuine issue of material fact because "the time sheets provided contradict[ed] Plaintiffs' central factual allegation").

Here, Plaintiffs' claim they were frequently interrupted during their lunch breaks is blatantly contradicted by the undisputed, objective record.  Ceridian kept records of when

Plaintiffs themselves clocked themselves out for and back in from lunch using their fingerprint. (SOF ¶ 74)  Maxean, Dorelus, Saint Louis, and Saintil each admitted that they would clock out for meal breaks but would not clock back in from their meal break if someone interrupted their meal break.  (SOF ¶ 73)  Thus, according to their testimony, any time these Plaintiffs clocked themselves out and back in from meal breaks, they took their full, uninterrupted meal break.

Undisputed records provided by Ceridian show that Maxean himself clocked out and back in for ~362 out of 428 meal breaks (85% of his breaks), Saint Louis himself clocked out and back in for ~338 out of 448 meal breaks (75% of his breaks), Saintil himself clocked out and back in for ~236 out of 311 meal breaks (76% of his breaks), and Dorelus himself clocked out and back in for ~313 out of 539 meal breaks (58% of his breaks).  (SOF ¶¶ 75-78)  This undisputed, objective evidence conclusively shows these Plaintiffs' allegations that they rarely took a meal break are false.  (*Cf.* SOF  ¶ 34 (Maxean testifying that he "only took a 30-minute meal break on approximately 10-15% of my shifts"), ¶ 53 (Saint Louis testifying that he took a 30-minute lunch break "[p]robably 20 percent of the time"), ¶ 72 (Saintil testifying that he "only took a 30-minute meal break on approximately 20% of my shifts"), ¶ 40 (Dorelus testifying that he "only took a 30-minute meal break on approximately 20% of my shifts").)

Further, BAGS expected, and night shift Plaintiffs understood, that they should take meal breaks during down time when no planes were arriving or departing.  (SOF ¶ 92)  Plaintiffs on the evening shift had extensive amounts of down time.  (SOF ¶¶ 84-91)  In fact, the undisputed, objective record shows that, on the 1,125 days between May 1, 2016 and May 31, 2019, there was at least one 30-minute or more gap with no arriving or departing flights between 5:30 p.m. and the last flight before the 4:00 a.m. morning shift on *1,120 of those days (99.6%)*, with an average of 5.3 such gaps on each evening shift.  (SOF ¶ 94)  The undisputed, objective record

also shows that, on the 1,125 days between May 1, 2016 and May 31, 2019, there was at least

one 60-minute or more gap with no arriving or departing flights between 5:30 p.m. and the last

flight before the 4:00 a.m. morning shift on *1,033 of those days (91.8%)*, with an average of 1.7

such gaps on each evening shift.  (SOF ¶ 95)

Finally, regarding Pierre-Louis, the Spring Shot data show he serviced no chairs for at

least a half an hour between 11:00 a.m. and the end of his break – the very time period wherein

he testified that he would take his breaks.  (SOF ¶¶ 99-101)  For this additional reason, the Court

should grant summary judgment for Defendants.

## IV.    PLAINTIFFS' BREACH OF CONTRACT CLAIMS FAIL BECAUSE PLAINTIFFS HAD NO EMPLOYMENT CONTRACT

Plaintiffs all admit that they had no contract for employment, but were at will employees

of BAGS and, therefore, Plaintiffs cannot create a genuine issue of material fact about whether

BAGS breached any now alleged employment contract.

To make out a *prima facie* case of breach of contract under Florida law, Plaintiffs must

establish: "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting

from the breach."  *Cucinotta v. CVS Pharmacy, Inc.*, No. 12-CV-1194, 2012 WL 5467524, at *2

(M.D. Fla. Nov. 9, 2012).  To establish the existence of a contract under Florida law, Plaintiffs

must establish "an offer, an acceptance, and consideration."  *Cucinotta*, 2012 WL 5467524, at

*2.  "[M]ere unilateral expectations … do[] not create binding contractual terms between

Employees and their employer."  *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 577 (Fla. Ct. App.

2002).  And under Florida law, "an employment contract requires definiteness and certainty in its

terms."  *Muller v. Stromberg Carlson Corp.*, 427 So.2d 266, 268 (Fla. Ct. App. 1983).  Plaintiffs

cannot create a genuine issue of material fact about whether they had a contract with BAGS for

anything other than at will employment both because they all agreed, in writing, that they could

have no contract other than at will employment and because Plaintiffs' admissions show they had

no contract with BAGS other than at will employment.

Plaintiffs signed or acknowledged a BAGS Handbook Acknowledgement that contained

the following language:

> I understand and agree that, other than the president of the
> Company, no manager, supervisor or representative of the
> Company has any authority to enter into any agreement for
> employment other than at-will; only the president of the Company
> has the authority to make any such agreement and then only in
> writing signed by the president of the Company.
>
> ****
>
> I understand that, except for the employment-at-will status, any
> and all policies, guidelines and practices may be changed at any
> time by the Company and the Company reserves the right to
> change my hours, wages and working conditions at any time.

(SOF ¶¶ 9-11.)  They can have no claim for breach of contract based on alleged failure to pay all

wages contractually owed.

This is supported by *Quaker Oats*.  There, plaintiffs won a jury verdict for unpaid

overtime wages under a breach of contract theory.  *Quaker Oats*, 818 So.2d at 576.  Plaintiffs

claimed that an employee manual discussing how the defendant would pay overtime created a

contract because, according to plaintiffs, "they were told prior to being hired that the manuals

were contracts."  *Id*. at 579.  The Florida Court of Appeals reversed, finding there was no

contract as a matter of law because plaintiffs signed a statement in their employment applications

that "no agreement for employment was valid unless with the express, written approval of the

president or chief executive officer of Quaker Oats."  *Id*. at 576, 579.

Similarly, in *Cucinotta*, plaintiff alleged defendant breached a contract with her when it

terminated her for absenteeism after an alleged agreement with her store manager.  *Cucinotta*,

2012 WL 5467524, at *1, 3.  The court found that the store manager could not have created a

contract with her because the employee handbook "provides unambiguous notice to employees that 'No one is authorized to provide any employee with an employment contract or special arrangement concerning terms or conditions of employment unless the contract is in writing and signed by the president.'" *Id*. at *3-4.

Finally, in *Carlucci v. Demings*, 31 So.2d 245, 246 (Fla. Ct. App. 2010), plaintiffs sued their employer for rescinding a directive providing that the employer would cover health insurance benefits for retirees. The court found that, because of a provision providing that the employer "expressly reserves the exclusive right to unilaterally amend or cancel Written directives," plaintiffs had no claim as a matter of law. *Id*. at 246-247. The court found that the employer's "unilateral act of implementing an internal policy that was subject to unilateral amendment or cancellation cannot constitute a contract." *Id*. at 247. The Court, like the courts in *Quaker Oats*, *Cucinotta*, and *Carlucci*, should find that Plaintiffs have no contract with BAGS, given the Handbook Acknowledgement as a matter of law.

However, even absent the Handbook Acknowledgement, Plaintiffs could not maintain a breach of contract claim against BAGS because their admissions – including multiple straightforward admissions where Plaintiffs admitted they had no contracts with BAGS – show they have no such claim as a matter of law.

In their depositions, Plaintiffs Hilaire, Vedrine, and Dorelus outright admitted that they had no contracts or agreements with BAGS. (SOF ¶ 12) For this additional reason, the Court should enter summary judgment for Defendants on Plaintiffs' breach of contract claim. *See Lokey v. F.D.I.C.*, 608 F. App'x 736, 739 (11th Cir. 2015) (affirming summary judgment on breach of contract claim where "Appellants … admit they had no contract with any of the Defendants").

The testimony of Plaintiffs Pierre-Louis, Saintil, and Maxean also demonstrate that they had no employment contract with BAGS. Pierre-Louis testified that the "contract" he was referring to in his Complaint consisted of phone calls where he told Silva he had not been paid for all hours worked and Silva would say he would fix it.[4]  (SOF ¶ 14)  There was no offer, acceptance, or consideration.  *See Kelley v. Metro. Life Ins. Co.*, No. 13-CV-61864, 2013 WL 5797367, at *2 (S.D. Fla. Oct. 28, 2013) ("Plaintiff alleges that the Employment Contract established his employment with Defendant and his entitlement to commissions.  Defendant's failure to pay commissions under that contract is the breach underlying Plaintiff's claim. Plaintiff has nevertheless failed to plead a claim for breach of the Employment Contract because he has not alleged offer and acceptance of the contract and has not specified its essential terms.") (internal citations omitted).[5]

Maxean testified that his contract with BAGS was simply his agreement to work for BAGS as a wheelchair agent.  (SOF ¶ 13)  Saintil testified that his contracts with BAGS were his application forms, new hire paperwork, and interview, and that, regarding payment the contract was his expectation that "I go to work, I work, therefore I need to be paid for the time that I work."  (SOF ¶ 15)  None of these purported "contracts" contain the "essential terms" which Plaintiffs claim they are seeking enforcement of.  For this additional reason, the Court should find that Plaintiffs' breach of contract claim fails as a matter of law.

## V.      PLAINTIFFS' BCLWO CLAIM FAILS AS A MATTER OF LAW

---

[4] Even if Plaintiffs' allegations were accurate, BAGS still paid Plaintiffs in excess of the minimum wage for all hours worked given their base rates that were well above the minimum wage.  *See Lundy v. Catholic Health Sys. Of Long Island Inc.*, 711 F.3d 106, 115-16 (2d Cir. 2013).

[5] *See also Slora v. Sun %2Cn Fun Fly-In, Inc.*, 173 So. 3d 1099, 1104 (Fla. Ct. App. 2015) ("an offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it") (quotation marks and brackets omitted); *Office Pavilion S. Fla., Inc. v. ASAL Prod., Inc.*, 849 So. 2d 367, 370 (Fla. Dist. Ct. App. 2003) ("The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.") (brackets omitted).

Plaintiffs' BCLWO claim fails because Plaintiffs cannot create a genuine issue of material fact about whether BAGS paid them at a rate lower than that required under the BCLWO.

Under the BCLWO, employers *offering* qualifying health care benefits, need to pay employees a wage of no less than $12.03 per hour in 2017, a "wage of no less than … $12.38 per hour" for work performed in 2018, and a "wage of no less than … $13.27 per hour" for work performed in 2019.  Broward Cty., Fla. Code §§ 26-102(a)(1)-(a)(2) (brackets removed); Living Wage, Broward Cty. Bd. Of Cty. Comm'rs Workshop (Oct. 16, 2018).[6]  BAGS offered Plaintiffs health insurance.  Therefore, unless Plaintiffs can prove that BAGS paid them at a rate lower than these rates or that the benefits BAGS offered them were insufficient, Plaintiffs cannot establish a violation of the BCLWO.

Florida interprets its wage and hour laws under the FLSA.  *Anagnos*, 721 F. App'x at 903-04.  It is well established that how to calculate an employee's rate of pay under the FLSA is to divide the total non-overtime amount "actually paid" to an employee "by the number of hours worked":

> [T]he regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed. In the case of piece work wages, this regular rate coincides with the hourly rate actually received for all hours worked during the particular workweek, such rate being the quotient of the amount received during the week divided by the number of hours worked.

*Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) (internal citations omitted); *see also Walling v. Harnischfeger Corp.*, 325 U.S. 427, 430-31 (1945) (rejecting argument that the "regular rate" of pay can be set by contract and holding that, to discover that

---

[6] Available at www.broward.org/Commission/Meetings/Documents/Living%2520Wage%2520-%2520Final%2520PDF.pdf.

rate, "we look . . . to the actual payments" divided by the number of hours worked); *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 n.16 (1942) (vacated on other grounds by Portal-To-Portal Act) ("Wage divided by hours equals regular rate.").  Because of this, employees cannot recover unpaid minimum wages for alleged unrecorded hours when their actual rate of pay – dollars paid divided by hours worked – meets or exceeds the minimum wage.  *E.g., Jackson v. First Student Mgmt., LLC*, No. 16-CV-557, 2017 WL 10874175, at *3-4 (M.D. Fla. Apr. 20, 2017) ("Gap time is defined as 'uncompensated hours worked that fall between the minimum wage and the overtime provisions of the FLSA. . . . the FLSA's text simply does not consider or afford a recovery for gap-time hours") (citing cases).

Even assuming, contrary to the record, that Plaintiffs took no lunch breaks, they never received less than $12.03 per hour for work performed in 2017, $12.38 per hour for work performed in 2018, $13.27 per hour for work performed in 2019.

BAGS, by Plaintiffs' own admission, paid Plaintiffs at an hourly rate of $13.59 in during 2017, $13.98 during 2018, and $14.90 during 2019.  (SOF ¶ 19)  According to Plaintiffs, BAGS scheduled them to work four days per week and reduced their hours to as low as 26 hours per week.  (SOF ¶ 52)  Had they worked through a lunch break on each of their four shifts, BAGS still would have paid them a wage well above the BCLWO floors:

- 2017: $13.59 x 24 hours = $326.16 in wages.  $326.16 / 26 hours = $12.54 per hour.

- 2018: $13.98 x 24 hours = $335.52 in wages.  $335.52 / 26 hours = $12.90 per hour.

- 2019: $14.90 x 24 hours = $357.60 in wages.  $357.60 / 26 hours = $13.75 per hour.

If Plaintiffs were on-the-clock for over 24 hours, their hourly rates would only increase. Plaintiffs cannot meet their burden of establishing a violation of the BCLWO and the Court should grant summary judgment to Defendants.

## CONCLUSION

The Court should enter summary judgment for Defendants.

DATED this 10th day of January, 2019.

Respectfully submitted,

*/s/  Jennifer Monrose Moore*
Jennifer Monrose Moore
Florida Bar No. 35602
jennifer.moore@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida 33602
Telephone: (813) 289-1247
Facsimile (813) 289-6530

Christopher M. Cascino
Illinois Bar No. 6296046 (*Pro Hac Vice*)
chris.cascino@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
  STEWART, P.C.
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Telephone: (312) 558-1245
Facsimile: (813) 289-6530
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of January, 2020, the foregoing was filed via

CM/ECF which will send notice of electronic filing to:

Kristy M. Johnson
Jason R. Alderman
The Alderman Law Firm
9999 N.E. 2nd Avenue, Suite 211
Miami Shores, Florida  33138

*/s/ Jennifer Monrose Moore*
Attorney

41362818.5